**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**



THE COMMONWEALTH OF VIRGINIA,     :
VIRGINIA OFFICE FOR PROTECTION     :
AND ADVOCACY,                      :
                                   :
       Plaintiff,          :   CASE NUMBER:  3:07CV734 (REP
                                   :
v.                                 :
                                   :
JAMES S. REINHARD, in his official :
Capacity as Commissioner, Department :
of Mental Health, Mental Retardation :
and Substance Abuse Services, of the :
Commonwealth of Virginia, DENISE   :
D. MICHELETTI, in her official capacity :
as Director, Central Virginia Training :
Center, and CHARLES M. DAVIS, in his :
official capacity as Director, Central State :
Hospital,                          :
                                   :
       Defendants.         :

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

I. Introduction

     The Commonwealth of Virginia, Virginia Office for Protection and Advocacy (VOPA) brings this action to redress the refusal of Defendants to provide VOPA with documents to which VOPA is legally entitled. The documents at issue relate to substantiated instances of the abuse or neglect of residents at Central Virginia Training Center (CVTC) and Central State Hospital (CSH) that resulted in serious injury or death.

VOPA is an agency of the Commonwealth of Virginia, created by statute, Chapter 8.1 of

Title 51.5, Code of Virginia.  VOPA has been designated as the Protection and Advocacy System

(P&A) for persons with disabilities in the Commonwealth of Virginia. Code of Va. §51.5-39.2.

The P & A system is a creation of three federal statutes: the Developmental Disabilities

Assistance and Bill of Rights Act ("DD Act"); 42 U.S.C § 15001, *et seq.*, the Protection and

Advocacy for Individuals with Mental Illness Act ("PAIMI Act"), 42 U.S.C. § 10801, *et seq.*, and

the Protection and Advocacy for Individual Rights Act, 29 U.S.C. § 794c, *et seq.*  A state cannot

receive federal funds for services to persons with developmental disabilities unless it has

established a P&A system.

Congress enacted the DD Act to protect the human and civil rights of those with

developmental disabilities in response to inhumane and despicable conditions that had been

discovered at New York's Willowbrook State School for persons with developmental disabilities.

*Alabama Disabilities Advocacy Program v. J.S. Tarwater Developmental Center*, 97 F.3d 492,

494 (11th Cir. 1996); *Wisconsin Coalition for Advocacy, Inc. v. Czaplewski*, 131 F.Supp.2d

1039, 1045 (E.D.Wis. 2001), *Equip for Equality, Inc. v. Ingalls Memorial Hospital*, 292

F.Supp.2d 1086 (N.D. Ill. 2003).  42 U.S.C. § 15043.  Under the DD Act, VOPA has the duty

and authority to "investigate incidents of abuse and neglect of individuals with developmental

disabilities" and to "pursue legal, administrative, and other appropriate remedies or approaches to

ensure the protection of, and advocacy for, the rights of such individuals[.]"  42 U.S.C. §

15043(a)(2)(A)-(B).  In order to fulfill its duty to investigate and remedy instances of the abuse

and neglect of persons with developmental disabilities, the DD Act provides VOPA the authority

to access records.  42 U.S.C. § 15043(a)(2)(I)-(J).

2

Similarly, the PAIMI Act was designed to create independent protection and advocacy

(P&A) systems to "investigate incidents of. . . neglect of individuals with mental illness and to

take appropriate action to protect and advocate the rights of such individuals." <u>Pennsylvania</u>

<u>Protection and Advocacy v. Houstoun</u>, 228 F.3d 423, 425 (3d Cir. 2000).  Under the PAIMI Act,

VOPA has the duty and authority to "investigate incidents of abuse and neglect of individuals

with mental illness if the incidents are reported to the system or if there is probable cause to

believe that the incidents occurred" and "pursue administrative, legal, and other appropriate

remedies to ensure the protection of individuals with mental illness." 42 U.S.C. § 10805.  In

order to fulfill its duty to investigate and remedy instances of the abuse and neglect of persons

with mental illness, the PAIMI Act provides VOPA the authority to access records. 42 U.S.C. §

10806.

Peer review is a process by which a committee of medical professionals investigates the

care and treatment provided in order to determine whether accepted standards of care have been

met.  Such committees "function primarily to review, evaluate, or make recommendations on"

issues including the adequacy or quality of professional services and patient safety.  Code of Va.

§ 8.01-581.16.  The peer review records sought in this matter discuss the circumstances

surrounding serious incidents at CVTC and CSH, evaluate the facility's respective practices in

response to the incidents, and identify processes and systems requiring improvement and

appropriate courses of action.  These records may provide extremely valuable information about

resident care and treatment and instances of abuse and neglect of residents; access to these

records is crucial to VOPA's federal mandates.  Defendants' refusal to provide VOPA with access

to such records will continue to cause VOPA, if its motion is not granted, irreparable harm.

3

Specifically, VOPA will be unable to fulfill its obligation to ensure that the rights of individuals with disabilities are protected.

II. Statement of Facts

VOPA is designated by State law to provide protection and advocacy services for persons with disabilities. Code of Va. § 51.5-39.1, et seq. VOPA is allocated federal funds pursuant to the DD and PAIMI Acts and is thereby obligated to provide protection and advocacy for persons with developmental disabilities and mental illness. 42 U.S.C. § 15001, *et seq.*; 42 U.S.C. § 10801, *et seq.*

The Commissioner, DMHMRSAS, is responsible for the supervision and management of the Department and its state facilities. Code of Va. § 37.2-304.

The Director, CVTC, is responsible for "the safe, efficient and effective operation" of the facility and for compliance with "all applicable federal and state statutes, regulations, policies and agreements." Code of Va. § 37.2-707.

Central Virginia Training Center is a DMHMRSAS-operated institution for persons with mental retardation located in Amherst County, Virginia.

The Director, CSH, is responsible for "the safe, efficient and effective operation" of the facility and for compliance with "all applicable federal and state statutes, regulations, policies and agreements." Code of Va. § 37.2-707.

Central State Hospital is a DMHMRSAS-operated institution for persons with mental illness located in Dinwiddie County, Virginia.

On or about October 18, 2006, an individual with mental retardation and mental illness hereinafter referred to as "Resident A", died while a resident of CVTC. Resident A had a

4

decades-long documented history at CVTC of ingesting non-edible items.  During October 2006, Resident A exhibited symptoms of bowel obstruction.  He was transported to a community hospital on October 4, 2006.  On October 10, 2006, an exploratory laparotomy was performed and two latex gloves were found in his intestines which were surgically removed.  Resident A died on October 18, 2006.

After receiving a report of resident A's death, VOPA initiated an investigation to determine whether or not the death was a result of abuse or neglect.  By letter dated November 16, 2006, VOPA requested  that CVTC provide VOPA with the results of any baseline analysis review, mortality review, risk management review and any other incident or peer review conducted in conjunction with Resident A's death. Also on November 16, 2006, VOPA requested the internal abuse and neglect investigation report from DMHMRSAS.  On December 18, 2006, VOPA received the internal abuse and neglect investigation report.  By letter dated November 20, 2006, the Director, CVTC, acknowledged receipt of VOPA's request for documents and stated that collection of the requested information had begun and that data that was then available would be provided by December 4, 2006.  By letter dated December 4, 2006, CVTC provided the preliminary autopsy report regarding Resident A and stated that the complete autopsy report and mortality review would be forwarded when completed, and that VOPA would receive a copy of the final report of the baseline analysis and review.  By letter dated June 5, 2007, VOPA renewed its request for the report of the baseline analysis review.[1]  On June 7, 2007, the Director, CVTC, acknowledged VOPA's request for a copy of the final report of the

---

1. DMHRSAS Departmental Instruction 401 defines an "event BAR" as follows:
> This means a Baseline Analysis and Review (BAR) of an event, which involves a fundamental and substantial examination of all surrounding facts and elements of the event, with a focus on constructive criticism and correction of any/all related systems and processes.

baseline analysis and review and stated that the information was being compiled and would be provided to VOPA by Jun 20, 2007. On June 22, 2007, VOPA received a "summation" of the baseline analysis and review. On July 12, 2007, VOPA renewed its request, in writing, for all documents constituting the baseline analysis review and risk management review. To date, those records have not been provided to VOPA.

On or about January 11, 2007, an individual with developmental disabilities hereinafter referred to as "Resident B" was assaulted at CVTC by another resident. The initial critical incident report, submitted to VOPA on January 16, 2007, indicated only that Resident B had been bitten on both ears by a peer, resulting in lacerations. The follow-up report submitted on February 5, 2007 provided few additional details. VOPA contacted Residents B's "authorized representative" who provided a consent for release of records by DMHMRSAS. On or about March 30, 2007, VOPA obtained the internal abuse and neglect investigation regarding the incident from DMHMRSAS Central Office. That report indicated that the injuries to Resident B were much more serious than the critical incident report implied. According to the abuse and neglect investigation, Resident B was observed by CVTC staff running from Resident B's room covered in blood. One staff member went to Resident B's room where she found multiple pieces of human ear tissue and a large amount of blood on the floor. A staff member picked up the pieces of ear and placed them in a washcloth that accompanied Resident B to the hospital. Resident B required intravenous antibiotics and medication for pain management. Based upon this more accurate depiction of the severity of the event, VOPA initiated a formal investigation into the incident on or about May 24, 2007. VOPA obtained a consent for release of CVTC records from Resident B's authorized representative. By letter dated June 8, 2007, VOPA

requested CVTC records regarding the injuries to Resident B including any risk management review or baseline analysis review conducted regarding the incident. On June 19, 2007, the Director, CVTC, acknowledged receipt of VOPA's request for records and stated that the information would be provided by June 28, 2007. On June 28, 2007, the Director, CVTC, forwarded documents to VOPA including "summations" of the baseline analysis review and risk management review of the incident. On July 12, 2007, VOPA renewed its request, in writing, for the baseline analysis review and risk management review. To date those records have not been provided to VOPA.

On, or about March 22, 2007, an individual with mental illness hereinafter referred to as "Resident C" died while a patient at CSH. Resident C had been held in some form of restraints for a period of approximately 33 hours before being released. About thirty minutes after Resident C was released from restraints, several CSH staff entered Resident C's bedroom to attempt to place Resident C into restraints. During the restraint incident, Resident C complained of being unable to breathe. Attempts to revive Resident C failed and Resident C was transported to a community hospital and was pronounced dead. On, or about April 5, 2007 after receiving the report of the death of Resident C while in the custody of DMRMHSAS, VOPA initiated an investigation of the death to determine whether or not the death was a result of abuse or neglect. On, May 31, 2007, VOPA requested in writing documents relating to the death of Resident C, including the root cause analysis, mortality review, and risk management analysis. On August 29, 2007, VOPA renewed its request, in writing, for the mortality review, root cause analysis, and risk management review. To date those records have not been provided to VOPA.

7

On August 13, 2007, counsel for Defendants informed VOPA that its request for access to the requested records was denied by the Commissioner, DMHMRSAS, on the basis of the peer review privilege.

III. Argument

A. Plaintiff has satisfied the standard for issuance of a preliminary injunction.

VOPA should be granted a preliminary injunction enjoining DMHMRSAS to provide VOPA with access to the requested records.  It is well settled that a District Court "has power to grant injunctive relief where there has been a deprivation of civil rights." *Sewell v. Pegelow*, 291 F.2d 196, 198 (4th Cir. 1961).

1.  Standard for preliminary injunction

In order to be awarded a preliminary injunction, a Plaintiff must satisfy the requirements set forth in *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189 (4th Cir.1977), and its progeny.  Four factors must be considered:

> (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied;
> (2) the likelihood of irreparable harm to the defendant if the requested relief is granted;
> (3) the likelihood that the plaintiff will succeed on the merits; and
> (4) the public interest

*Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353, 359 (4th Cir. 1991) (*quoting L.J. by and through Darr v. Massinga*, 838 F.2d 118 (4th Cir. 1988).

The two most important factors are (1) and (2).  These factors "should be weighed against one another" and if "the balance is in favor of the plaintiff, it is proper to grant interim

8

injunctive relief if grave or serious questions are presented for ultimate decision." *Massinga*, 838 F.2d. at 120 (*citing Blackwelder*).

> 2. VOPA will suffer irreparable harm if its Motion for a Preliminary Injunction is denied

VOPA easily satisfies the requirement of a "clear showing" that it will suffer irreparable harm in the absence of preliminary injunctive relief. *Direx Israel, Ltd. v. Breakthrough Medical Corp.*, 952 F.2d 802, 812 (4th Cir.1991). The refusal by Defendants to permit VOPA the access to records which it is entitled to by law makes it impossible for VOPA to carry out its statutory mandate. See *Robbins v. Budke*, 739 F.Supp. 1479, 488 (D. N.M. 1990); *Wisconsin Coalition for Advocacy, Inc. v. Czaplewski*, 131 F.Supp.2d 1039, 1051 (E.D.Wis. 2001).

> 3. The irreparable harm which VOPA will suffer if its Motion for a Preliminary Injunction is denied far outweighs any harm defendant will suffer if the motion is granted.

When this Court "balances the hardships" in this case, it is clear that the balance "tips decidedly" in the VOPA's favor. *Blackwelder*, 550 F.2d at 194, *Massinga,* 838 F.2d at 120. If VOPA's Motion for a Preliminary Injunction is denied, it will be unable to carry out its statutory obligation to provide effective protection and advocacy services to individuals with disabilities. Congress intended that the Commonwealth of Virginia, like other states, have "effective" P&A systems, not simply *pro forma* organizations which have the theoretical power to investigate cases of possible neglect but no effective way to carry out those investigations. *Mississippi Protection & Advocacy System, Inc. v. Cotten,* 929 F.2d 1054 (5th Cir. 1991). If this Court denies VOPA's Motion, VOPA will be irreparably harmed in ways reaching far beyond this case, as its

ability to carry out future investigations, to ferret out abuse and neglect, would be severely compromised.

Conversely, if VOPA's Motion for a Preliminary Injunction is granted, Defendants will merely be required to do that which the law requires. *Wisconsin Coalition for Advocacy v. Czapelewski*, 131 F.Supp.2d 1039, 1052 (E.D. Wis. 2001); *Iowa Protection and Advocacy Services v. Gerard Treatment Programs, L.L.C.*, 152 F.Supp.2d 1150, 1174 (N.D. Iowa 2001); *Advocacy Center v. Stadler*, 128 F.Supp.2d 358, 368 (M.D. La. 1999).

Hence, it is inarguable that the "balance of hardships" "tips decidedly" in VOPA's favor. As a result, in order to be granted the Preliminary Injunction it seeks, VOPA need only establish that it raises "serious and grave" questions "as to make them fair ground for litigation." *See*, *Blackwelder*, 550, F.2d. at 194; *Multi-Channel TV Cable Company v. Charlottesville Quality Cable Operating* Company, 22 F.3d 546, 551 (4th Cir. 1994).

4. VOPA raises "severe and grave" questions for litigation.

In this case, VOPA presents the "serious and grave" question of whether VOPA will be able to fulfill its statutorily mandated obligation to provide an array of protection and advocacy services for individuals with mental illness. This question is presented because of Defendants' refusal to provide VOPA with the access to records provided for under the DD Act. The issues raised by Defendants' restriction of VOPA's access go to the very heart of the P&A system—a system which was created to "protect the human and civil rights" of persons with disabilities, "this most vulnerable population." *Tarwater*, 97 F.3d at 494. If VOPA cannot exercise its right of access it will be unable to fulfil its "important investigatory function," *Cotten*, 929 F.2d at

10

1058, and it, and, more importantly, the over one million Virginians with disabilities, will be irreparably harmed.

   5. The public interest will be served by granting VOPA's Motion.

   Finally, it is clear that the public interest will be served by granting VOPA's motion for a preliminary injunction. First and foremost, granting VOPA's Motion will further the intent of Congress in passing the DD Act. Granting VOPA's Motion will fulfill Congress' intent that Virginia have an "effective" P&A system. *Cotten*, 929 F.2d at 1058. Similarly, granting VOPA's Motion will further the public's interest in eliminating the mistreatment of persons with disabilities, by allowing VOPA to do that which it was intended to do: protect and advocate the rights of individuals with disabilities. *See*, 42 U.S.C. §15043 (DD Act); 42 U.S.C. § 10803 (PAIMI Act).

   B. P&A System Access Authority

   Federal statutes and regulations require that protection and advocacy systems have access to facilities and to records of individuals with disabilities. See 42 U.S.C. §§ 15043, 10805(a)(4) and 10806. Courts have consistently held that the DD and PAIMI Acts require states to permit the P&A agency to operate effectively, and with broad discretion and independence in gaining access to facilities and records. The court in *Cotten* expounded upon this obligation as follows:

>    The Act not only describes the range of services to be provided by the
>    protection and advocacy systems, it also states that the systems **must have the**
>    **authority** to perform these services. The state cannot satisfy the requirements
>    of the [DD Act] by establishing a protection and advocacy system which has
>    this authority in theory, but then taking action which prevents the system from
>    exercising that authority.

*Cotten*, 929 F.2d at 1058 (emphasis in original). As the court noted in *Alabama Disabilities*

*Advocacy Program v. Tarwater Developmental Ctr.*, any other reading "would attribute to

Congress an intent to pass an ineffective law."  894 F. Supp. at 429.

The DD Act provides that a P&A system "shall" have access to facilities that provide care

and treatment for individuals with developmental disabilities and to "all" records of those

individuals.  42 U.S.C. § 15043.  The regulations to the DD Act further define "records" to

include:

> Reports prepared by an agency charged with investigating incidents
> of abuse or neglect, injury or death occurring at a facility or while
> the individual with a developmental disability is under the care of a
> member of the staff of a facility, or by or for such facility, that
> describe any or all of the following:
> (i) Abuse, neglect, injury, death;
> (ii) The steps taken to investigate the incidents;
> (iii) Reports and records, including personnel records, prepared or
> maintained by the facility in connection with such reports of
> incidents; or,
> (iv) Supporting information that was relied upon in creating a
> report, including all information and records which describe
> persons who were interviewed, physical and documentary evidence
> that was reviewed, and the related investigative findings[.]

45 C.F.R. § 1386.22

The PAIMI Act provides that a P&A system "shall" have access to facilities that provide

care and treatment for individuals with developmental disabilities and to "all" records of those

individuals.  42 U.S.C. §§ 10805, 10806.  The regulations to the PAIMI Act further define

"records" to include:

> (2) Reports prepared by an agency charged with investigating
> abuse neglect, or injury occurring at a facility rendering care or
> treatment, or by or for the facility itself, that describe any or all of
> the following:
> (i) Abuse, neglect, or injury occurring at the facility;
> (ii) The steps taken to investigate the incidents;

(iii) Reports and records, including personnel records, prepared or maintained by the facility, in connection with such reports of incidents; or

(iv) Supporting information that was relied upon in creating a report, including all information and records used or reviewed in preparing reports of abuse, neglect or injury such as records which describe persons who were interviewed, physical and documentary evidence that was reviewed, and the related investigative findings.

42 C.F.R. §51.41

## C. P&A Access to Peer Review Records

Four Federal Circuit Courts have held that the access authority of P&As extends to peer review records. *Missouri Protection & Advocacy v. Missouri Department of Mental Health*, 447 F.3d 1021 (8th Cir. 2006); *Protection & Advocacy for Persons with Disabilities, State of Connecticut v. Mental Health and Addiction Services*, 448 F.3d 119 (2nd Cir. 2006); *Center for Legal Advocacy v. Hammons*, 323 F.3d 1262 (10th Cir. 2003); *Pennsylvania Protection & Advocacy, Inc. v. Houstoun*, 228 F.3d 423 (3rd Cir. 2000).

The Third Circuit Court of Appeals held that "a peer review report is a 'record[] of ...an [] individual' under [PAIMI] and that the P&A "was entitled to have 'access' to [peer review records]." *Pennsylvania Protection & Advocacy, Inc. v. Houstoun,* 228 F.3d at 427. The *Houstoun* case involved the Pennsylvania P&A's attempt to access peer review records in order to investigate the suicide of a resident of a state-operated psychiatric hospital. *Id.* at 425-426. The state denied the P&A access, claiming that the records were protected under the state's peer review statute. *Id.* at 426. The Pennsylvania peer review statute provides that "[t]he proceedings and records of a review committee shall be held in confidence and shall not be subject to discovery or introduction into evidence in any civil action." 63 Pa. Stat. § 425.4. The *Houstoun* court ruled that peer review reports fell within the scope of records to which the P&A was

entitled access. 228 F.3d at 427. The court noted that the PAIMI Act authorizes P&As to access "all records of" an individual with mental illness and found that the plain language of the definition of "records" "encompasses the peer review reports at issue here, since they are clearly 'reports prepared by . . . staff of a facility rendering care and treatment.' *Id*. at 426. The court rejected assertions that: (1) only incident reports are covered by the term "records" and that (2) in any case, the records cannot be disclosable because they are the hospital's property, and not the "records of any individual" (the phrase referenced in the PAIMI Act's access provisions). *Id*. at 426-427.

The *Houstoun* court held that the PAIMI Act clearly preempts "any state law that gives a healthcare facility the right to withhold" peer review reports. *Id*. at 428. However, the court concluded that there is no conflict between the state law in issue and federal law because the P&A sought the peer review records as part of a statutorily authorized investigation and not as a means of discovery or to introduce them in a civil action. *Id*. The Court also noted that the PAIMI Act requires that a P&A maintain the confidentiality of such reports, which further supports the finding that disclosure to the P&A is not prohibited by state law. *Id*. at 428-429. The court observed that the state statute does not say who is required to keep the report in confidence, and that the statute has been interpreted as permitting release under certain circumstances. *Id*. at 428.

The Second, Eighth and Tenth Circuit decisions essentially follow the reasoning of the *Houstoun* court, holding that the PAIMI Act preempts state peer review laws because the PAIMI Act unambiguously gives P&A systems access to all records related to an individual, including peer review records. *Protection & Advocacy for Persons With Disabilities v. Mental Health &*

*Addiction Services*, 448 F.3d 119 (2d Cir. 2006), *Missouri Protection and Advocacy Services v. Missouri Department of Mental Health*, 447 F.3d 1021, (8th Cir. 2006), *Center for Legal Advocacy v. Hammons*, 323 F.3d 1262 (10th Cir. 2003).

In *Hammons*, the Tenth Circuit determined that there was an "actual conflict" between the PAIMI Act and the Colorado peer review law and held that PAIMI preempted State law. 323 F.3d at 1273. The Second Circuit stated that "[i]n the circumstances presented in this case, we do not see an actual conflict between PAIMI and Connecticut law" but that "[t]he Department insists that one exists" and held that "to the extent that there is a conflict, PAIMI governs." 448 F.3d at 129. The Eighth Circuit held that, to the extent the state law on peer review conflicted with PAIMI, PAIMI "expressly preempted" Missouri law. 447 F.3d 1024.

The courts have given no weight to legislative history surrounding the PAIMI Act which states that the Act should not be interpreted as preempting state laws regarding disclosure of peer review records. Also, the courts have invalidated a regulation implementing both the DD and PAIMI Acts that echoes this legislative history (42 CFR 51.41(c)(4) and 45 CFR 1386.22(c)(1)). Concluding that nothing in the text of the Act precludes access to peer review records, the *Houstoun* court discounted a 1991 House committee report, which stated that the PAIMI Act should not be interpreted as preempting state laws regarding disclosure of peer review records. 228 F.3d. at 427. The court stated that the PAIMI Act regulation which echoes the House report language (42 CFR 51.41(c)(4)) "does not represent a reasonable interpretation of the statute, and we must therefore reject it." *Id.* at 427. The court reasoned that the Act gives P&As access to "a defined category of records. Peer review reports either fall within that definition or they do not."

15

*Id.* at 428.  The court noted that neither committee report language nor a regulation purporting to exempt peer review reports can be construed as negating this clear language.  *Id.*

D. The DD Act

The DD Act is the counterpart to the PAIMI Act for individuals with developmental disabilities.  Like the PAIMI Act provisions considered in *Houstoun, et al.*, the DD Act provides that P&A systems have the authority to access "all records of…any individual with a developmental disability."  42 U.S.C. § 15043(a)(2)(I).  Further, the definition of "record" within the DD Act, like the PAIMI Act, includes "a report prepared or received by any staff at any location at which services, supports, or other assistance is provided to individuals with developmental disabilities" and "a report prepared by an agency or staff person charged with investigating reports of incidents of abuse or neglect, injury, or death occurring at such location, that describes such incidents and the steps taken to investigate such incidents[.]"  42 U.S.C. § 15043(c).

E. Interrelation of the P&A Programs' Access Provisions

Congress clearly intended that the access authority under the DD and PAIMI programs be consistently applied.  The preamble to the PAIMI Act's regulations states that it is the goal of the Department of Health and Human Services "to ensure that all facets of the P&A system administered by the Department [PAIMI and DD Programs] are subject to the same requirements." 62 FR 53548, 53549. (Oct. 15, 1997).  The preamble notes that "a basic principle of statutory construction is that where statutes govern similar substantive areas, and affect similar classes of individuals, courts often attempt to construe such statutes *in pari materia* and might interpret certain provisions of the DD Act as applying to the [PAIMI] Act as well."  The

16

legislative history of the PAIR Program provides that, in implementing the Program, the

Rehabilitation Services Administration (within the Department of Education) shall adopt the

same policies as have been applied by the Administration on Developmental Disabilities (within

the Department of Health and Human Services) under the DD Act; the purpose of this approach

is to "ensure consistency and uniformity of interpretation." S. Rep. 357, 102nd Cong., 2d Sess.

100 (1992). Congress expressed a similar intent with regard to the consistent application of the

PAIMI and DD Acts. See, e.g., S. Rep. 454, 100th Cong., 2d Sess. 10 (1988); S. Rep. 109, 99th

Cong., 1st Sess. 3 (1986); S. Rep. 113, 100th Cong., 1st Sess. 24 (1987).

      The PAIMI and DD Acts are parallel systems of protection and advocacy that differ only

in the population they are designed to serve.  Courts have frequently turned to the provisions of

one Act to explain the other.  See e.g. *Arizona Ctr. for Disability Law v. Allen*, 197 F.R.D. 689,

692 (D.Ariz.2000) (explaining that Developmental Disabilities Act, 42 U.S.C. 15043, directs

each state to authorize a system to investigate reports of abuse and neglect of people with

developmental disabilities, and that the same protections were extended to people with mental

illness under the PAIMI Act in 1986); *Iowa Prot. & Advocacy Services, Inc. v. Gerard Treatment

Programs, L.L.C.*, 152 F.Supp.2d 1150, 1166 (N.D. Iowa 2001) (incorporation of provision

identical to that in DD Act into PAIMI Act supported conclusion that PAIMI Act intended to

permit P&A same access to records as permitted under DD Act); *Advocacy Center v. Stalder*,

128 F. Supp.2d 358, 360 fn 2 (M.D. La. 1999) ("case law under the DD Act is helpful to the

court in determining right to access under the [PAIMI] Act".); *Alabama Disabilities Advocacy

Program v. J.S. Tarwater Developmental Center*, 894 F. Supp. 424, 428 (M.D. Ala. 1995), aff'd,

97 F.3d 492 (11th Cir. 1996) (legislative history suggests that the record access provisions of the

17

PAIMI and DD Acts are meant to be "consistent."); *Iowa Protection and Advocacy Services, Inc., v. Gerard Treatment Programs, LLC*, 152 F.Supp 2d 1150 (N.D. Iowa 2001) (without engaging in any analysis, reading DD Act time frames for release of records into PAIMI Act); *Protection and Advocacy System, Inc. v. David Freudenthal*, 412 F. Supp. 2d 1211 (D. Wy. 2006)(court approved settlement agreement which stated that "facilities will use the deadlines in the DD Act as a guideline for requests under the PAIMI Act, but this approach should reflect a good faith analysis of the nature and the extent of the request).

The reasoning of the courts that have addressed the issue of P&A system access to peer review records under the PAIMI Act applies with equal force to access under the DD Act. The Acts are intended to be coextensive in the protections that they provide for individuals with disabilities and, accordingly, in the authority of P&A systems to provide protection and advocacy services. Access to peer review records is just as essential for an effective system for protecting and advocating the rights of individuals with developmental disabilities under the DD Act as it is for individuals with mental illness under the PAIMI Act.

IV. Conclusion

For the reasons stated above, this Court should issue a preliminary injunction requiring Defendants to grant VOPA the access to records required by the DD and PAIMI Acts, including peer review records, and forbidding Defendants from interfering, in any way, with VOPA's fulfillment of its statutory mission.

Dated: 12/3/2007

18

Respectfully Submitted,


Paul J. Buckley
Virginia Bar Number 33794
Managing Attorney
Virginia Office for Protection and Advocacy
1910 Byrd Avenue, Suite 5
Richmond, VA 23230
(804) 662-7082
(804) 662-7431
paul.buckley@vopa.virginia.gov